## CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
## AND JAMES CITY COUNTY

Doe et al.

v.

Bruton Parish Church et al.

July 10, 1997

Case No. (Law) 7977

468

■■■■■■■

By Judge Donald W. Lemons

The matters before the court are demurrers and motions in the case of *Doe 1, an infant who sues by his father and next friend, Doe 3, et al. v. Bruton Parish Church et al.* filed in the Circuit Court of the City of Williamsburg and James City County against Bruton Parish Church, the Diocese of Southern Virginia of the Episcopal Church, Rector of Bruton Parish Church Richard Leslie May, the Church Insurance Company, Trustee of Bruton Parish Church James S. Kelly, Trustee of Bruton Parish Church George F. Wright, Church Attorney and Trustee of Bruton Parish Church Vernon M. Geddy, Trustee of the Diocese of Southern Virginia Lon Fisher, Trustee of the Diocese of Southern Virginia Carolyn H. Neal, Trustee of the Diocese of Southern Virginia Hugh S. Meredith, Chancellor and Trustee of the Diocese of Southern Virginia David A. Dashiell, Bishop O'Kelley Whitaker of the Diocese of Southern Virginia, Bishop Frank H. Vest, Jr., of the Diocese of Southern Virginia, Richard W. Weaverling, and Hortense Weaverling. The plaintiffs in this case are twenty-seven individuals allegedly injured by some or all of the defendants. They include fourteen children and thirteen parents.

The defendants fall into four groups. The court will refer to groups of defendants as Church Defendants (Bruton Parish Church, Rector May, James Kelly, George Wright, Vernon Geddy, and Lon Fisher), Diocese Defendants (Diocese of Southern Virginia, Carolyn Neal, Hugh Meredith, David Dashiell, Bishops Whitaker and Vest), the Church Insurance Company, and Richard and Hortense Weaverling.

On April 15, 1997, Plaintiffs were granted leave to file a Second Amended Motion for Judgment which currently includes ten counts alleging various causes of action against various defendants.

Count I alleges that defendant Richard Weaverling knowingly, intentionally, maliciously, and wantonly caused bodily injury to each of the infant plaintiffs by sexually abusing them, causing them both physical and mental pain and suffering. See Second Amended Motion for Judgment (SAMJ) at ¶¶ 105-12.

Count II alleges defendant Richard Weaverling acted with willful and wanton disregard of plaintiff's rights and lacks remorse for his actions. Punitive damages are requested. See SAMJ at ¶¶ 113-18.

Count III alleges defendant Hortense Weaverling, mother of Richard Weaverling, breached a duty she owed to the children in her care by allowing Richard to babysit them with her when she knew or should have known of Richard's "propensities for sexual and other physical perversion and abuse." See SAMJ at ¶¶ 119-23.

Count IV alleges defendant Hortense Weaverling negligently failed to warn Bruton Parish, the Diocese, Rector May, and all plaintiffs before he was hired to babysit children of the "assaultive sexually deviant behavior" of Richard Weaverling. See SAMJ at ¶¶ 124-27.

Count V alleges defendants Hortense and Richard Weaverling acted at all times within the actual or apparent authority of defendants Bruton Parish Church, Diocese, Rector May, and Bishops Vest and Whitaker and that those defendants are vicariously liable for the actions of defendants Richard and Hortense Weaverling. See SAMJ at ¶¶ 129-36.

Count VI alleges defendants Diocese, Bruton Parish, Bishops Vest and Whitaker, and Rector May negligently hired and retained defendants Hortense and Richard Weaverling by failing to conduct a background investigation or conduct a home visit prior to hiring them. See SAMJ at ¶¶ 137-42.

Counts VII through X were withdrawn by plaintiffs.

Count XI alleges defendants Diocese, Bruton Parish Church, Rector May, Church Attorney Geddy, Chancellor Dashiell, Bishops Vest and Whitaker, and the Church Insurance Company conspired to fraudulently conceal and misrepresent the nature and extent of the alleged sexual misconduct of Richard Weaverling. See SAMJ at ¶¶ 170-78.

Count XII alleges (either all defendants, as in title, or Church Defendants and the Weaverling Defendants, as in ¶ 180) are liable for the medical and related expenses and loss of services the plaintiff parents have incurred. See SAMJ at ¶¶ 179-80.

Count XIII alleges (either all defendants, as in title, or Church Defendants and the Weaverling Defendants, as in ¶ 182) intentionally and negligently inflicted emotional distress upon the plaintiffs by their outrageous conduct, causing severe and permanent emotional distress, including injuries which require medications and damage to the reputation of the plaintiffs. See SAMJ at ¶¶ 181-88.

Count XIV alleges Rector May, Church Attorney Geddy, Vestryman, Advisory Committee Member, Bishops Vest and Whitaker, and Chancellor are individually liable for the misconduct, obligations, and damages of Bruton Parish Church, the Diocese, and their respective volunteers, servants, and other agents. See SAMJ at ¶¶ 189-90.

The matters before the court include demurrers to almost all counts of the SAMJ by various defendants, as well as to joinder under the Multiple Claimant Litigation Act, Va. Code Ann. §§ 8.01-267.1 to 8.01-267.9 (Supp. 1997). Defendant Church Insurance Company has also filed a Motion for More Definite Statement, a Motion to Sever Plaintiffs and to Sever the Church Insurance Company from the other defendants. The Church Defendants have

filed a Motion to Sever Richard Weaverling. Both the Church Defendants and the Diocese Defendants have filed Pleas of Statutory Immunity on behalf of certain individual defendants pursuant to Va. Code Ann. § 8.01-220.1:1 (1992).

## I. *Multiple Claimant Litigation Act*

Plaintiffs have filed their SAMJ invoking in the Preamble, the Multiple Claimant Litigation Act, Va. Code Ann. §§ 8.01-267.1 to 8.01-267.9 (Supp. 1997). Defendants have not only demurred to the Preamble invoking the Act, but have also filed motions to sever each of the Plaintiffs' claims. Under the Multiple Claimant Litigation Act, a circuit court may enter an order joining, coordinating, or consolidating separate civil actions subject to certain findings and conditions. In an action filed with six or more plaintiffs, a defendant's motion to sever shall be granted unless the court finds the claims would have met the requirements of the Act if filed separately. § 8.01-267.5. In summary, the court must either make the following findings and invoke the Act or grant Defendants' motions to sever.

To invoke the Act the court must find that separate civil actions by six or more plaintiffs involve common questions of law or fact, and arise out of the same transaction or occurrence, or series of transactions or occurrences, the common questions of law or fact predominate and are significant to the actions and, the order will, (i) promote the ends of justice and the just and efficient conduct and disposition of the actions, (ii) be consistent with each party's right to due process, and (iii) not prejudice each party's right to a fair trial and impartial resolution of each action. § 8.01-267.1.

In making these findings, factors to be considered by the court include, but are not limited to the following: the nature of the common questions of law or fact, the convenience to parties, witnesses and counsel, the relative stages of the litigation and the work to date of counsel, the efficient utilization of judicial facilities and personnel, the court's calendar, the likelihood and disadvantages of inconsistent rulings, the likelihood of prompt settlement of the litigation without the entry of the order, the likelihood of prejudice or confusion to a jury. § 8.01-267.1.

The court has considered the above factors and finds they weigh heavily in favor of consolidation under the Act at this stage in the proceedings. The court therefore finds this is an action filed by six or more plaintiffs, that involves common questions of law and fact. The actions arose out of a series of transactions or occurrences set into motion by the hiring of Richard Weaverling and Hortense Weaverling and ending with an alleged conspiracy

by the Church to conceal his abuse of the children. The court finds that, with the allegations before it, common questions of law and fact predominate and are significant to the actions. Invoking the Act now will promote the ends of justice and the efficient conduct of the actions by coordinating discovery. No party's rights to due process or rights to a fair and impartial resolution are violated by joining the actions in this pre-trial, discovery stage.

Therefore, Defendants' motions to sever Plaintiffs' claims are denied at this time, and the demurrers to joinder under the Multiple Claimant Litigation Act are overruled. Pursuant to § 8.01-267.6 the court may sever matters for trial purposes.

Church Defendants' motion to sever Richard Weaverling is denied at this time. Under the Multiple Claimant Litigation Act, the court "may organize and manage the combined litigation and enter further orders consistent with the right of each party to a fair trial as may be appropriate to avoid unnecessary costs, duplicative litigation or delay and to assure fair and efficient conduct and resolution of the litigation ...." § 8.01-267.1. Defendant's motion to sever the Church Insurance Company is denied for the same reasons as stated in denying defendant's motion to sever Richard Weaverling.

## II. *Additional Demurrers*

In considering a demurrer, the court must apply the "settled rule that a demurrer admits the truth of all well-pleaded material facts. All reasonable factual inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading. However, a demurrer does not admit the correctness of the pleaders's conclusions of law." *Russo v. White*, 241 Va. 23, 24, 400 S.E.2d 160, 161 (1991) (quoting *Fox v. Custis*, 236 Va. 69, 71, 372 S.E.2d 373, 374 (1988)).

### A. *Count II: Punitive Damages for Intentional, Malicious, Willful, and Wanton Misconduct Against Richard Weaverling*

Defendants demur to this count on the ground that even if Richard Weaverling was acting within the scope of his employment, they cannot be held liable in punitive damages for his actions.

In Virginia, punitive damages cannot be awarded against an employer for the actions of an employee unless the employer participated in, ratified, or authorized the wrongful acts of its employee. See *Freeman v. Sproles*, 204 Va. 353, 358, 131 S.E.2d 410, 414 (1963); *Hogg v. Plant*, 145 Va. 175, 181, 133 S.E. 759, 760 (1926).

Plaintiffs contend that when the Church Defendants allegedly conspired to "delay, minimize, downplay, condone, ratify, misrepresent, conceal and ignore" Weaverling's actions, they ratified his conduct. Clearly, Church Defendants did not participate in any of the acts of Richard Weaverling. To "ratify" means "to authorize or otherwise approve, retroactively, an agreement or conduct either expressly or by implication." *Black's Law Dictionary* 1262 (6th ed. 1990). The court is not bound by plaintiffs' legal conclusion that Church Defendants "ratified" Richard Weaverling's conduct. A review of the pleadings reveals no allegations of fact that could fairly be said to support Plaintiffs' conclusion.

Defendants' demurrer to Count II is sustained. Plaintiffs are given leave to amend.

## B. *Count III: Breach of Duty to Children by Hortense Weaverling*

Section 315 of the *Restatement of Torts 2d*, states there is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless:

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Restatement (Second) of Torts* § 315 (1965).

Most Virginia cases on the subject have dealt with the duty to protect under 315(a), where a special relationship exists between the actor and the third party, for example a duty on the part of a parole officer to control a parolee. Although the court has found no Virginia cases creating a 315(b) special relationship, it finds authority for the proposition that Virginia does recognize 315(b) relationships. The Supreme Court in *Fox* in determining whether a parole officer had a duty to control a parolee, analyzed the relationship under 315(b) before determining that 315(a) and 319 applied. "Section 315(b) is not apposite because no special relationship existed between the Department of Corrections, or its employees, and these plaintiffs." *Fox* at 74, 372 S.E.2d at 376. In determining whether a landlord had a duty to protect a tenant, the Supreme Court in *Gulf Reston, Inc. v. Rogers*, 215 Va. 155, 207 S.E.2d 841 (1974), quoted 315(b) and then cited § 320 of the Restatement for examples of special relationships. *Gulf Reston* at 158, 207 S.E.2d at 844. See

*Restatement 2d of Torts*, cmt. c (stating the relationships described in § 315(b) are described in §§ 314A and 320).

Section 320 of the Restatement 2d details one of the 315(b) special relationships and is most applicable to this case because the duty alleged is one Hortense Weaverling (the actor) owed to the children (the other) to protect them from Richard Weaverling (the third party).

One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor

(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and

(b) knows or should know of the necessity and opportunity for exercising such control.

*Restatement 2d of Torts* § 320.

Comment b to 320 states that a child at school comes within the protection of this rule because he is deprived of the protection of his parents and the actor who takes custody of a child is "properly required to give him the protection which the custody or the manner in which it is taken has deprived him." *Restatement 2d of Torts* § 320, cmt. b.

The court is of the opinion that caring for a child as a babysitter in the context of this case is analogous to taking care of children at school. The child is deprived of the protection of his parents, and the babysitter owes a duty to the child to exercise reasonable care in controlling the conduct of third persons if the babysitter (1) knew she had the ability to control the third person and (2) if the babysitter knew or should have known of the necessity for such control. By alleging that Hortense Weaverling sent Richard as her substitute, Plaintiffs have alleged that she had the ability to direct or control Richard. By alleging Hortense Weaverling knew or should have known of Richard's propensity for sexual perversion, Plaintiffs have alleged that she should have known of the necessity to control Weaverling.

Defendants correctly cite *Bell v. Hudgins*, 232 Va. 491, 352 S.E.2d 332 (1987), for the proposition that Virginia has rejected the imposition of civil liability upon parents who fail to control their minor child's criminal behavior; however, Plaintiffs do not base their cause of action upon the parent-child

relationship between Hortense and Richard Weaverling. Plaintiffs allege that the parent-child relationship may have given Hortense Weaverling access to information, but it is not the *status* of parent and child that serves as the basis of their claims.

Finally, the "special relationship" alleged in Count III is supported by the legislative enactment of § 40.1-103 of the Code of Virginia which provides in part:

> It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the life of such child to be endangered or the health of such child to be injured …. Any person violating this section shall be guilty of a Class 6 felony.

Va. Code Ann. § 40.1-103 (1994).

Defendant's demurrer to Count II is overruled.

## C. *Count IV: Negligent Failure to Warn by Hortense Weaverling*

The Church Defendants demur to this count on the ground that no cause of action exists in Virginia for the negligent failure to warn, citing *J. v. Victory Tabernacle*, 236 Va. 206, 372 S.E.2d 391 (1988). The court in *Victory Tabernacle* specifically declined to address the issue because appellant failed to submit authority concerning negligent failure to warn and abandoned the claim. *Victory Tabernacle* at 208, 372 S.E.2d at 393. This court, like the plaintiff in *Victory Tabernacle*, can find no authority supporting a cause of action for negligent failure to warn in this context. The Virginia Supreme Court has recognized a cause of action for the negligent failure to warn (1) invitees or employees about a dangerous condition on the premises, see *Burrus v. Suddith*, 187 Va. 473, 477-78, 47 S.E.2d 546, 549 (1948); *Goshen Furnace Corp. v. Tolley's Administrator*, 134 Va. 404, 414-15, 114 S.E. 728, 731 (1922), (2) consumers about dangerous conditions or uses of products, see *Owens-Corning Fiberglass Corp. v. Watson*, 243 Va. 128, 134-35, 413 S.E.2d 630, 634 (1992); *Featherall v. Firestone Tire and Rubber Co.*, 219 Va. 949, 962, 252 S.E.2d 358, 366-67 (1979), and even (3) rescue personnel about dangerous conditions on property, see *Pearson v. Canada Contracting Co.*, 232 Va. 177, 186, 349 S.E.2d 106, 111 (1986).

Plaintiffs cite no cases in support of this cause of action but, nonetheless, argue that it would be "premature" to grant the demurrer because a ruling is expected in October from the Virginia Supreme Court on the issue. In the

event that the Supreme Court recognizes this cause of action, Count IV will be reinstated.

Defendants' demurrer to Count IV is sustained.

## D. *Count V: Vicarious Liability for Acts of the Weaverlings*

The Diocese and Church Defendants demur to Counts I through V on the ground that Richard and Hortense Weaverling were not acting within the scope of their employment during their alleged acts.

Under the doctrine of respondeat superior, an employer is held liable for the tortious acts of its employee if the employee was performing his employer's business and acting within the scope of his employment when the tortious acts were committed. *Kensington Associates v. West*, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987) (citing *McNeill v. Spindler*, 191 Va. 685, 694, 62 S.E.2d 13, 17 (1950)). In determining whether the employee's tortious acts will be imputed to the principal, the doctrine's primary focus is whether the activity that gave rise to the tortious act was within the scope of the employee's employment. *Commercial Business Systems, Inc. v. BellSouth Services, Inc.*, 249 Va. 39, 44, 453 S.E.2d 261, 265 (1995).

Generally, an act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's business, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business. See *Kensington* at 432, 362 S.E.2d at 901. An act that arose wholly "from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account" is not within the scope of his employment. *Broaddus v. Standard Drug Co.*, 211 Va. 645, 653, 179 S.E.2d 497, 503-04 (1971); *Cary v. Hotel Reuger, Inc.*, 195 Va. 980, 984, 81 S.E.2d 421, 423 (1954).

Where the relationship of employer-employee is established, the burden is on the employer to prove the employee was not acting within the scope of his employment when he committed the tortious act. See *Broaddus v. Standard Drug Co.* at 653-54, 179 S.E.2d at 504; *Kensington* at 432-33, 362 S.E.2d at 901. When the employee's actions are a slight and not unusual, or on the other hand, a great and unusual deviation from the employer's business, a court shall determine, as a matter of law, whether an employee's acts were within the scope of his employment. When, however, the evidence places the case between these two extremes, the determination is one for the jury. See *Kensington* at 433, 362 S.E.2d at 902.

Recently, the Virginia Supreme Court applied the doctrine of *respondeat superior* in *Plummer v. Center Psychiatrists, Ltd.*, 252 Va. 233, 476 S.E.2d 172 (1996). Dr. Roque Gerald provided counseling and therapy to Katrina Plummer, who was suffering from depression. Despite knowledge of her fragile state of mind and prior suicide attempts, Gerald allegedly committed an assault and battery on Plummer by seducing her into having sexual intercourse with him. *Plummer* at 235, 476 S.E.2d at 173. The trial court sustained Center Psychiatrists' demurrer and held as a matter of law that Gerald was acting outside the scope of his employment when he engaged in sexual intercourse with Plummer. *Id.*

The Supreme Court reversed, holding the facts alleged by Plummer were sufficient to create a jury issue as to whether Gerald was acting within the scope of his employment. "According to the plaintiff's allegations, Gerald's act was committed while he was performing his duties as a psychologist in the execution of the services for which he was employed, in this instance, counseling and therapy." *Id.* at 237, 174.

This court finds it hard to reconcile *Plummer* with previous case law applying *respondeat superior*. The majority relied almost exclusively on *Commercial Business Systems*, quoting the test as "not the motive of the employee in committing the act complained of, but whether that act was within the scope of the duties of employment and in the execution of the service for which he was engaged." *Plummer* at 236-37, 476 S.E.2d at 174 (quoting *Commercial Business Systems* at 45, 453 S.E.2d at 266). The majority decision did not analyze whether Gerald's actions were (1) expressly or impliedly directed by the employer or were naturally incident to the business, and (2) performed with the intent to somehow perform the employer's business, although possibly mistakenly or ill-advisedly. See *Kensington* at 432, 362 S.E.2d at 901; *Broaddus v. Standard Drug Co.* at 653, 179 S.E.2d at 503-04; *Cary* at 984, 81 S.E.2d at 423; *Tri-State Coach Corp. v. Walsh*, 188 Va. 299, 307, 49 S.E.2d 363, 367 (1948); *Davis v. Merrill*, 133 Va. 69, 77, 112 S.E. 628, 630-31 (1922). Nor did the majority decision discuss whether sexual intercourse with a patient was a "great and unusual" or "slight and not unusual" deviation from Center Psychiatrists' business of providing therapy services to those in need. See *Kensington* at 433, 362 S.E.2d at 902; *Broaddus* at 654, 179 S.E.2d at 504; *McNeill* at 695, 62 S.E.2d at 18.

The *Plummer* dissenting opinion is compelling in its conclusion that Gerald's actions were not, as a matter of law, within the scope of his employment. Justice Koontz's dissent, with whom Chief Justice Carrico and Justice Compton joined, found that Gerald stepped aside from the business of Center Psychiatrists in his seduction of Plummer and clearly was not intending

to further his employer's business by having sex with his client. See *Plummer* at 240, 476 S.E.2d at 176 (Koontz, J. dissenting). The dissenters agreed with the trial court that Gerald's act was a "great and unusual" deviation from his employer's business and thus could not be within the scope of his employment. *Id.*

Although this court recognizes the *Plummer* dissent as more consistent with the Supreme Court's prior decisions, it feels compelled to follow the direction of the majority opinion. Utilizing the language of *Plummer*, the court finds that the Plaintiffs have alleged that "[Weaverling's] act was committed while he was performing his duties as a [babysitter] in the execution of the services for which he was employed, in this instance, [babysitting]." *Plummer* at 237, 476 S.E.2d at 174.

In the present case, following the mandate of *Plummer*, the Defendants do not conclusively establish that Richard Weaverling was not acting within the scope of his employment when he allegedly abused the children as a church employee at the church nursery and at various church functions off-premises. Considering the allegations in a light most favorable to the Plaintiffs, a reasonable jury might conclude that Richard Weaverling's abuse of the children as the church babysitter arose out of some attempt to perform his duties, which included changing diapers, removal of clothing, and hand-wiping of genitalia while assisting the children in the bathroom. Since the alleged acts are, however, more than a slight departure from his babysitting duties, the Court thereby holds that the determination of vicarious liability for acts committed "within the scope of employment" is a question for the jury.

Plaintiffs seek to hold Bruton Parish Church and Diocese Defendants vicariously liable for abuse that occurred in private homes. Specifically Plaintiffs allege that Richard Weaverling abused infant Does 1, 4, 24, and 27 in their own homes, and that at all times the Weaverling Defendants acted within the actual or apparent authority of Bruton Parish, Rector May, Bishops and Diocese, and in the scope and course of their employment, agency, and service.

Plaintiffs's pleadings contain the following allegations:

> Paragraph 62: … Defendants were hired by Bruton Parish, Rector May, and Diocese and were specifically held out, suggested by and vouched for by Bruton Parish, Rector May, and Diocese as individuals who were fit and appropriate for babysitting activities in the homes of Parishioners, including the parent plaintiffs herein.

Paragraph 132: ... Bruton Parish, Rector May, Bishops, and Diocese, hired, selected, employed, retained, supervised, and maintained the Weaverling Defendants as duly authorized babysitters for the purposes of babysitting children including the Infant Plaintiffs at the church premises, the homes of the infant plaintiffs, and other locations.

Paragraph 134: ... babysitting and church related activities were subject to direct control and supervision of Bruton Parish, Rector May, Bishops, and Diocese, and the Weaverling Defendants acted at all times herein with and within the actual and apparent authority of Bruton Parish, Rector May, Bishops, and Diocese, and in the scope and course of their employment, agency, and service.

Considering the facts alleged and giving the Plaintiffs all reasonable inferences fairly and justly drawn from the facts alleged, it appears that Plaintiffs allege that some babysitting activity took place in private homes but pursuant to the "actual authority" of church defendants. Also the plaintiffs appear to claim vicarious liability on the part of church defendants for acts that occurred while the Weaverlings were engaged in babysitting for individual members of the church unrelated to employment by the church but within the "apparent authority" of church defendants.

The church defendants claim that they cannot be held vicariously liable for acts that occurred while the Weaverlings were "privately" employed by individual members of the church. But the court must look to the allegations in the pleadings themselves. Plaintiffs' allege that various defendants "hired, selected, employed, retained, supervised, and maintained the Weaverling Defendants" and that in the course of such employment the Weaverlings babysat infant plaintiffs in private homes. Whether the proof will support the pleadings is not at issue at this stage of the proceedings.

Church defendants also demur to any claim of vicarious liability for the conduct of Hortense Weaverling. For the reasons stated above the matter will be submitted to the jury.

The demurrer is overruled.

E. *Count VI: Negligent and Grossly Negligent Hiring and Retention*

The Church and Diocese Defendants demur to this count for various reasons. First, they maintain that Plaintiffs fail to allege facts supporting their claim that the Church knew or should have known that Richard and Hortense

Weaverling were unfit employees. Second, the defendants claim there is no cause of action for negligent retention in Virginia, and even if this court recognized negligent retention, Plaintiffs failed to allege facts that show the Weaverlings should have been fired. The Diocese argues the Church had to have actual knowledge of unfitness and that a rule otherwise would entangle church and state.

The court would first like to distinguish the cases, all from other jurisdictions, cited by the Diocese. All three cases recognized an entanglement of church and state in determining whether a church negligently hired clergy members because it would force a court to determine what makes one competent to serve as a member of that church's clergy. "[S]uch a determination would require interpretation of the church canons and internal church policies and practices," and therefore would implicate First Amendment concerns. *Pritzlaff v. Archdiocese of Milwaukee*, 533 N.W.2d 780, 790 (Wis. 1995). Plaintiffs in this case are not alleging the negligent hiring of a clergy member requiring such an analysis, but the negligent hiring of a babysitter with no religious duties or spiritual responsibilities to the church or the parishioners. Constitutional values are not compromised by making that inquiry.

"Virginia has long recognized the tort of negligent hiring." *J. v. Victory Tabernacle Baptist Church*, 236 Va. at 208, 372 S.E.2d at 393. The independent tort of negligent hiring operates as an exception to the charitable immunity of religious institutions. See *Victory Tabernacle* at 210, 372 S.E.2d at 394. The Supreme Court, in *Victory Tabernacle*, quoted a law review article in order to distinguish the doctrine of *respondeat superior* from the tort of negligent hiring and inadvertently defined the tort in Virginia. "The employer is principally liable for negligently placing an unfit person in an employment situation involving an unreasonable risk of harm to others." *Id* at 211, 394 (quoting *Minnesota Developments — Employer Liability for the Criminal Acts of Employees Under Negligent Hiring Theory*, 68 Minn. L. Rev. 1303, 1306-07 (1984)). The plaintiff in *Victory Tabernacle* apparently only alleged that when Victory Baptist hired the alleged sex abuser, it knew or should have known that the abuser had been convicted of aggravated sexual assault on a young girl. The Court held that allegation was "fully sufficient" to state a cause of action of negligent hiring to survive defendant's demurrer. *Victory Tabernacle* at 211, 372 S.E.2d at 394.

A federal district court in the Western District of Virginia first recited this quote as the test for negligent hiring and expanded the quote by saying negligent hiring "conditions liability on the employer's knowledge that the employee's past *actions* strongly suggest that he is unfit for a job which

involves an unreasonable risk of harm to others." *Simmons v. Baltimore Orioles, Inc.*, 712 F. Supp. 79, 81 (W.D. Va. 1989) (emphasis in original). Judge Markow in two separate Circuit Court opinions, and most recently a federal district court judge in the Western District of Virginia, quoted the *Simmons* "test" of negligent hiring. See *Williams v. Dowell*, 34 Va. Cir. 240, 242-43. (Richmond City 1994); *Dawkins v. Richmond Community Hospital*, 30 Va. Cir. 377, 379 (Richmond City 1993); *Hott v. VDO Yazaki Corp.*, 922 F. Supp. 1114, 1129 (W.D. Va. 1996).

The plaintiffs in *Victory Tabernacle* alleged the defendants knew or should have known that the employee had been convicted of aggravated sexual assault on a young girl and that as a condition of his probation was not to come into contact with children. See *Victory Tabernacle* at 207, 372 S.E.2d at 392. In *Davis v. Merrill*, 133 Va. 69, 112 S.E. 628 (1922), the Supreme Court in finding sufficient evidence to support Plaintiff's contention that the defendant was liable for employing an unfit person for the position, noted that no one inquired as to the employee's past record, habits, or general fitness for the job, and that if the employer had investigated, the employer would probably not have offered the position. See *Davis* at 80, 112 S.E. at 631.

The court is convinced then that the definition of negligent hiring is placing a person in an employment situation involving an unreasonable risk of harm to others, when the employer knew or should have known that person was unfit for the job.

Plaintiffs allege that defendants Bruton Parish, Rector May, Bishops Vest and Whitaker, and the Diocese negligently hired and retained Hortense and Richard Weaverling by placing "unfit persons in an employment situation involving an unreasonable risk of harm to the Infant Plaintiffs." SAMJ ¶139. Plaintiffs need to allege at least one specific fact which, if known to the defendants "would have deterred a reasonable employer." *Hott*, 922 F. Supp. at 1130. Plaintiffs claim if the Defendants had investigated the Weaverlings' background or made a home visit prior to hiring them, they would have discovered that Richard Weaverling had an "unhealthy home family situation," owned hard core pornography magazines, had a "very unusual predilection" toward children, had few or no peers as friends, harbored anger about supposedly being "mistreated" by his uncle, liked to lay down with, listen to music with, nap with, tickle and wrestle with, change diapers of, and make bathroom trips with young children, bought violent comic books, had a fascination with spanking, befriended and reportedly had sexual relations with a "severely retarded underage girl."

It seems clear that plaintiffs have alleged at least one "fact" that, if known, they claim would have deterred a reasonable employer from hiring Richard

Weaverling. The court sees the problem as whether a reasonable investigation would have revealed any of the above information. If there is an articulable standard for the degree of investigation that should be done for this particular job, the court finds that the determination of whether Bruton Parish and the other defendants complied with that standard is a question for the jury.

Although it is clear the tort of negligent hiring exists in Virginia, it is not so clear as to whether the independent tort of negligent retention exists in Virginia. At least three federal district courts and one Virginia Circuit Court have held negligent retention is not recognized in Virginia. See *Tennant v. American Home Products*, 34 Va. Cir. 256, 261 (Richmond City 1994); *Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 797-98 (E.D. Va. 1996); *Hines v. ITT Defense & Electronics, Inc.*, 1996 U.S. Dist. LEXIS 16530 (W.D. Va. Sept. 17, 1996); *Hott v. VDO Yazaki Corp.*, 922 F. Supp. at 1130. However, the Fourth Circuit held in a sexual discrimination case that "[s]ince Virginia recognizes the tort of negligent hiring, logic suggests that it would also recognize a cause of action based on an employer's negligent retention of an employee who displays dangerous tendencies after his hiring." *Paroline v. Unisys Corp.*, 879 F.2d 100, 112 (4th Cir. 1989), *superseded en banc on other grounds*, 900 F.2d 27 (4th Cir. 1990).

This court, however, finds support for the existence of negligent retention in the Virginia Supreme Court case of *Philip Morris, Inc., v. Emerson*, 235 Va. 380, 368 S.E.2d 268 (1988). After finding that Philip Morris negligently hired a subcontractor, A-Line, by failing to investigate at all A-Line's qualifications for the dangerous work being performed, the Court stated "[m]oreover, [Philip Morris] negligently failed to discharge A-Line after observing a number of incidents demonstrating A-Line's incompetence and negligence in dealing with the dangerous chemicals." *Philip Morris* at 400, 368 S.E.2d at 278. The Supreme Court recognized that it had not ruled directly on such an issue previously, but it had "invoked the underlying rationale for the tort of negligent retention" in the context of charitable institutions. *Id.* at 401, 368 S.E.2d at 279 (citing *Norfolk Protestant Hospital v. Plunkett*, 162 Va. 151, 155-56, 173 S.E. 363, 365 (1934) (holding jury was warranted in finding hospital negligent in its selection and retention of a nurse after the nurse violated hospital rules and had been repeatedly reprimanded, but not fired)).

The Court in *Philip Morris* cited an Ohio case holding the state negligent in its retention of an independent contractor and applied the duty of care articulated in that case to Philip Morris' actions. "Given the highly dangerous nature of the activity and the obviously inadequate response to that danger, no reasonable person could believe Saddington was not negligent in failing to terminate A-Line's services, if not after the first day, certainly after the second

day of its work." *Philip Morris* at 401, 368 S.E.2d at 279. The Court, in ruling as a matter of law that Philip Morris negligently retained A-Line, additionally had before it detailed evidence of A-Line's incompetency and the employer's knowledge of the problems after hiring. This court does not have such detailed evidence, only allegations that some parents complained to the Church about the performance of the Weaverlings as early as 1992 and as late as May 1994, and thereby determines that the question as to whether the defendants negligently retained the Weaverlings after learning of their unfitness, is a question for the jury. The court notes that Plaintiffs do not recite the basis of any complaints concerning the Weaverlings in 1992. It is alleged that Richard Weaverling took children off the premises of Bruton Parish Church during 1992 to 1994. After certain Church defendants were informed on September 16, 1994, of sexual abuse occurring in a parishioner's home on the previous day, even the Plaintiff's allegations are that the Church defendants monitored Richard Weaverling on the following Sunday and he was discharged from employment on September 23, 1994. Based upon what is alleged in the pleadings, the factual basis for the claim of negligent retention appears weak but it is sufficient to withstand demurrer.

Defendants' demurrer as to Count VI is overruled.

### F. *Count XI: Civil Conspiracy to Conceal and Misrepresent Fraudulently*

A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose or to accomplish some lawful purpose by criminal or unlawful means. See *Hechler Chevrolet v. General Motors Corp.,* 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985) (citing *Werth v. Fire Adjust. Bureau,* 160 Va. 845, 855, 171 S.E. 255, 259, cert. denied, 290 U.S. 659 (1933)). There can be no conspiracy to do that which the law allows, and to survive demurrer, an allegation of conspiracy must at least allege an unlawful act or an unlawful purpose. See *Hechler* at 402, 337 S.E.2d at 748. Defendants demur to this count on the basis that no unlawful purpose or means was alleged in plaintiffs' pleadings.

From Plaintiffs' allegations, the court understands the purpose of the alleged conspiracy was to shield the Church from "civil liability." SAMJ ¶¶ 171-72. This purpose is not in and of itself unlawful; consequently, plaintiffs must allege that the defendants used some unlawful means to accomplish that purpose. According to Plaintiffs, the means the defendants used to shield themselves from liability was fraudulently concealing and/or misrepresenting the nature and extent of the alleged sexual misconduct of Richard Weaverling,

which, according to plaintiffs, constitutes unlawful, actionable fraud. See SAMJ ¶¶ 172-76.

Since the "basis of the action is the wrong which is done under the conspiracy," a court must look to the allegations of that underlying wrong to determine whether or not pleadings state a cause of action for civil conspiracy. *Gallop v. Sharp*, 179 Va. 335, 338, 19 S.E.2d 84, 86 (1942); *Citizens for Fauquier County v. SPR Corp.*, 37 Va. Cir. 44 (Fauquier County 1995). Since the underlying wrong alleged is fraud, the court will analyze plaintiffs' allegations under the well-established elements of fraud.

One who advances a cause of action for actual fraud bears the burden of proving (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. See *Virginia Natural Gas Co. v. Hamilton*, 249 Va. 449, 454-55, 457 S.E.2d 17, 21 (1995) (quoting *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994)). Where fraud is alleged, the pleading must show "specifically in what the fraud consists, so that the defendant may have the opportunity of shaping his defense accordingly, and since [fraud] must be clearly proved it must be distinctly stated." *Mortarino v. Consultant Engineering Services, Inc.*, 251 Va. 289, 293, 467 S.E.2d 778, 782 (1996) (citations omitted).

For the purposes of proving fraud, concealment, whether accomplished by word or conduct, may be the equivalent of a false representation when it involves a deliberate nondisclosure designed to prevent another from learning the truth. See *Spence v. Griffin*, 236 Va. 21, 28, 372 S.E.2d 595, 599 (1988). Therefore, concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud. See *Virginia Natural Gas* at 455, 457 S.E.2d at 21.

Defendants maintain that Plaintiffs have not alleged the elements of a civil conspiracy for fraud and that the "facts" they allege are inconsistent with the elements of a civil conspiracy for fraud. The court has reviewed the pleadings in great detail and finds that at least 53 paragraphs and numerous exhibits are offered in support of plaintiffs' claim of civil conspiracy for fraud. However, the volume of allegations cannot substitute for adequate allegations of the elements of the cause of action.

There is no factual basis for the conclusion reached by the plaintiffs concerning unlawful purpose or unlawful means. The allegation that the Church defendants and the Church Insurance Company desired to avoid liability does not involve an unlawful purpose. With respect to unlawful means, Plaintiffs rely upon allegations of breach of a standard of ecclesiastical care and failure to report child abuse pursuant to statute. However, plaintiffs

have abandoned the counts in their Motion for Judgment alleging causes of action based upon such conduct. If there was concealment of facts, where is the legal duty that supports the claim of unlawful means? What are the facts that allegedly were concealed from plaintiffs?

There are no allegations that any of the defendants charged with conspiracy knew that any of the children had been abused at the church. The allegations of the plaintiffs reveal that within several days of obtaining knowledge of abuse at a parishioners home, reports had been made to the police and social services. It is alleged that on September 15, 1994, a parishioner discovered abuse of her child in her home; on the following day the information was conveyed to various church defendants; Richard Weaverling was carefully observed on the following Sunday while babysitting; on September 22, 1994, Richard Weaverling made a statement to police concerning sexual abuse of a particular infant; Richard Weaverling was discharged from babysitting services on September 23, 1994. Thereafter, police and social services investigations proceeded, the local Commonwealth's Attorney began an investigation, media coverage intensified, and efforts were made by Church defendants to communicate with members of the congregation.

Allegations of fraud must be pleaded with specificity. Clearly, plaintiffs are dissatisfied with the nature, method, and content of the communications; however, the court must determine if their allegations are sufficient to survive demurrer. They are not.

Defendants raise concerns about the ability of particular Plaintiffs to maintain this cause of action. It is not necessary to address this concern, because the court is sustaining the demurrer to the entire count. Additionally, Diocese defendants raise concerns over First Amendment issues related to this cause of action. It is not necessary to address these issues at this time.

The demurrer to Count XI is sustained. Plaintiffs are granted leave to amend.

## G. *Count XIII: Intentional and Negligent Infliction of Emotional Distress*

An analysis of Count XIII (including a review of ¶¶ 1-180 which are re-alleged in ¶ 181) reveals that Plaintiffs allege:

(a) intentional or reckless infliction of emotional harm by Richard Weaverling upon all of the plaintiffs,

(b) intentional or reckless infliction of emotional harm by Church defendants upon the parents who are plaintiffs, and

(c) negligent or reckless infliction of emotional harm by Hortense Weaverling upon all of the plaintiffs.

In the case of *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974), the Supreme Court outlined the elements of the tort known as "outrage" or "intentional infliction of emotional harm."

> We adopt the view that a cause of action will lie for emotional distress, unaccompanied by physical injury, provided four elements are shown: One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

*Womack* at 342, 210 S.E.2d at 148.

Clearly, the allegations against Richard Weaverling satisfy the first three requirements necessary to state a cause of action for intentional infliction of emotional harm with respect to the plaintiffs. However, lack of specificity concerning severity of damages on a plaintiff by plaintiff basis precludes the court from determining if the last element of the cause of action is present.

> The term "emotional distress" travels under many labels, such as, "mental suffering, mental anguish, mental or nervous shock .... It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." Restatement comment j. But liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it.
>
> Here, plaintiff alleged that she suffered "severe emotional distress" and "extreme emotional distress." But, even on demurrer, the court is not bound by such conclusory allegations when the issue involves, as here, a mixed question of law and fact. This is not a negligence case

where, according to Rule 3:16(b), an allegation of "negligence" is sufficient without specifying the particulars. In the present claim, "a plaintiff must allege all facts necessary to establish" the cause of action.

The plaintiff has alleged that she was nervous, could not sleep, experienced stress and "its physical symptoms," withdrew from activities, and was unable to concentrate at work. There is no claim, for example, that she had any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income. Consequently, we conclude that the alleged effect on the plaintiff's sensitivities is not the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it.

*Russo v. White*, 241 Va. 23, 27-28, 400 S.E.2d 160, 163 (1991).

The court may not presume the severity of damages that may have been incurred. A review of applicable case law makes it abundantly clear that specific damages must be alleged in order to determine on a case by case basis whether the tort has been sufficiently alleged.

The only factual allegations supporting Plaintiffs' claim of intentional or reckless infliction of emotional harm against Church defendants involve "conduct" after the alleged sexual abuse of the children stopped. The "conduct" in question involves claims of "coverup," "ostracizing," "intimidation," "concealment," and "misrepresentation," etc. In paragraph 182, Plaintiffs allege that such conduct was done "intentionally, willfully, and wantonly, or recklessly and with the specific purpose of inflicting emotional distress upon the plaintiffs." In paragraphs 183 and 184, Plaintiffs allege that the conduct was outrageous and intolerable and caused various injuries.

Notwithstanding the characterization by the Plaintiffs, the court must determine if the conduct alleged meets the requirements to state a cause of action. "But even on demurrer, the court is not bound by such conclusory allegations when the issue involves, as here, a mixed question of law and fact." *Russo* at 28, 400 S.E.2d at 163. In *Russo* the Supreme Court observed:

Under the second prong [of *Womack*], it is insufficient for a defendant to have "acted with an intent which is tortious or even criminal." Restatement comment d. Even if a defendant "has intended to inflict emotional distress," or his conduct can be "characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort," the requirement of the second prong has

not been satisfied. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." [Citations omitted.]

*Russo* at 27, 400 S.E.2d at 162.

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Womack* at 342, 210 S.E.2d at 148.

A careful review of the allegations made by the plaintiffs concerning the alleged conduct of Church Defendants and a comparison with other fact patterns considered by the Virginia Supreme Court compel this court to conclude that the allegations do not rise to the level of such extreme and outrageous conduct that it offends against the generally accepted standards of decency and morality such that liability should result. Additionally, although not argued by Defendants, it is precisely in this area of church counseling, ecclesiastical decision making, and church discipline that First Amendment interests may be implicated. Finally, the lack of specificity concerning the severity of damages alleged on a case by case basis is fatal to Plaintiff's claims.

Finally, Plaintiffs allege both negligent and reckless infliction of emotional harm by Hortense Weaverling upon all of the plaintiffs, parents and children. With respect to the allegations of reckless infliction of emotional harm, the standards articulated in *Womack* must be met. However, the court must look in the first instance to the conduct of Hortense Weaverling, not Richard Weaverling. Considering all of the allegations and all reasonable inferences fairly and justly drawn from the facts alleged, plaintiffs maintain that Hortense Weaverling knew or should have known about the sexual abuse of children by her son. Although it is not alleged that Hortense Weaverling had the specific purpose of infliction of emotional distress upon the children, it is alleged that her conduct was intentional or reckless and that she knew or should have known that emotional distress would likely result. If the allegations are true, her conduct does rise to such an extreme and outrageous level that it does

offend generally accepted standards of decency and morality such that liability should result. However, this claim also suffers from the lack of specificity concerning the severity of damages alleged on a case by case basis.

Plaintiffs allege negligent infliction of emotional harm by Hortense Weaverling upon all of the plaintiffs, parents and children. Unlike a claim of intentional or reckless infliction of emotional harm, in order to sustain a claim of negligent infliction of emotional harm, each of the plaintiffs must allege specific physical injury. As the Virginia Supreme Court noted in *Hughes v. Moore*, 214 Va. 27, 197 S.E.2d 214 (1973):

> We adhere to the view that where conduct is merely negligent, not willful, wanton, or vindictive, and physical impact is lacking, there can be no recovery for emotional disturbance alone. We hold, however, that where the claim is for emotional disturbance and physical injury resulting therefrom, there may be recovery for negligent conduct, notwithstanding the lack of physical impact, provided the injured party properly pleads and proves by clear and convincing evidence that his physical injury was the natural result of fright or shock proximately caused by the defendant's negligence. In other words, there may be recovery in such a case if, but only if, there is shown a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury.

*Hughes* at 34, 197 S.E.2d at 219.

Each of the children plaintiffs have pleaded physical injury sufficient to overcome the demurrer; however, the parents who are plaintiffs must allege physical injury to themselves in order to overcome the demurrer. The lack of specificity concerning physical injury to the individual parents and lack of specificity concerning the severity of damages alleged on a case by case basis are fatal to the plaintiffs' claims.

Defendants demurrer to Count XIII is sustained. The plaintiffs are granted leave to amend.

### H. *Count XII: Parent's Claims for Medical and Related Expenses and Loss of Services: All Defendants*

Church Insurance Company demurs to Plaintiffs' Claims for Medical and Related Expenses and Loss of Services. It appears from paragraph 180 of the SAMJ that the claim is only made against Church Defendants and Weaverling defendants; however the title to Count XII understandably concerns Church

Insurance Company. There are no facts which support a claim against Church Insurance Company for Medical and Related Expenses and Loss of Services. To the extent that it is necessary, the demurrer is sustained. Plaintiffs are given leave to amend.

Diocese Defendants demur to Count XII as well. It would appear from paragraph 180 that no claim is made against Diocese Defendants in Count XII and the demurrer is sustained. Plaintiffs are given leave to amend.

Church Defendants' demurrer to Count XII states, "In Count XII, the plaintiffs allege that these defendants are liable for the medical and related expenses incurred by the plaintiffs .... Because these claims are derived from the claims of the infant plaintiffs, they are barred for the reasons and to the same extent as stated elsewhere in this Memorandum." To the extent that demurrers have been sustained or overruled concerning the claims of the infant plaintiffs, Church Defendants' demurrer to Count XII is similarly resolved.

## I. *Count XIV: Individual Member Liability*

Church Defendants demur to Count XIV on the grounds that Plaintiffs have not stated any facts in support of such a cause of action. The liability of members of an unincorporated association is permitted under certain circumstances. The Virginia Supreme Court in *Cutlet v. Hawthorne,* 157 Va. 372, 161 S.E. 47 (1931), stated that "[m]embers of an unincorporated church organization, who are actually instrumental in incurring liabilities for it, or who either authorize or ratify its transactions or those made in its name, are personally liable therefor ...." *Cutlet* at 377, 143 S.E. at 48. An individual member of an unincorporated association is not liable for damages simply because they are a member. Participation in the activity or conduct that allegedly imposes liability or authorization or ratification is necessary in order to hold an individual member liable for damages based upon membership in an unincorporated association. Plaintiffs' conclusory allegations of ratification are not enough to overcome the demurrer. A review of the pleadings reveals no allegations of fact that could fairly be said to support Plaintiffs' conclusion. Additionally, Plaintiffs argue that the individuals named in paragraph 190 should be held liable based upon joint enterprise theory. Such a theory is different from the theory of liability of individual members of an unincorporated association. The facts necessary to support such a theory are not present in Plaintiffs' pleadings.

The demurrer to Count XIV is sustained. Plaintiffs are given leave to amend.

*J. Demurrer to Allegation of "Partnership"*

Defendant Church Insurance Company's demurrer and Church Defendants' demurrer to Plaintiffs statement in paragraph 54 of the SAMJ that Church Insurance was in "partnership" with Bruton Parish and the Diocese is sustained to the extent that a partnership invoking the law of partnership is alleged. The court finds no facts alleged amounting to an allegation of a partnership in the legal sense, and the Plaintiffs' counsel conceded this point in oral argument.

*K. Damages and Prayer for Relief*

Church Insurance Company demurs to any claim of Plaintiffs for attorney's fees. The court sees no such request in Plaintiffs' pleadings. Church Insurance Company further demurs to paragraph F of Plaintiffs' Prayer for Relief seeking "total damages" for all of the plaintiffs. This is not a class action.

The demurrer is sustained without leave to amend.

### III. *Other Motions and Pleas*

*A. Statutory Immunity*

Under § 8.01-220.1:1 of the Virginia Code, directors, trustees, and directors of certain tax exempt organizations are immune from civil liability for acts taken in their official capacity. However, this grant of immunity is limited. For example, such persons are not immune from liability if the claim arises from "a knowing violation of the criminal law." Va. Code Ann. § 8.01-220.1:1(C) (1992).

For immunity the following statutory requirements must be met:

The officers must show that their organization is in fact exempted from income taxation under § 501(c) or § 528 of the Internal Revenue Code. § 8.01-220.1:1(A).

Then the defendants must show that they are in fact "[d]irectors, trustees, and [or] officers" of the exempt organization. § 8.01-220.1:1(A).

For total immunity, the defendants must serve without compensation. § 8.01-220.1:1(A). If they serve with compensation, then the defendants face liability up to the amount of compensation they received in the past twelve months. § 8.01-220.1:1(B).

Compensation is defined as "payment for services over and above per diem and expenses." § 8.01-220.1:1(B).

The allegations against the defendants must not include "willful misconduct or a knowing violation of the criminal law" for the statute to apply. § 8.01-220.1:1(C).

At this stage in the proceedings, the factual record is inadequate to decide the issue, and the court defers its ruling. The defendants may place the matter before the court at such time as the matter is mature for resolution.

## B. *Motion for More Definite Statement*

The issues raised in Defendant Church Insurance's motion either have been resolved by this opinion or have been rendered moot because of the withdrawal of certain counts. Therefore, the motion is denied.

The court has rendered decisions on multiple demurrers, pleas, and motions; however, no order will be entered at this time. The appeal provisions of the Multiple Claimant Litigation Act are such that all parties may wish to have other matters resolved by the court so that appeals are taken simultaneously rather than piecemeal. The court will await formal notification from the parties concerning this matter.